**IN THE UNITED STATES BANKRUPTCY
COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

IN RE                                              : CHAPTER 11
                                                   :
LAGUARDIA ASSOCIATES, L.P.                         :
        DEBTOR(S)                             : BANKRUPTCY NO.  11-19334 SR
_____

# OPINION

BY:  STEPHEN RASLAVICH, CHIEF UNITED STATES BANKRUPTCY JUDGE.

*Introduction*

      The above Debtor, joined by the Official Committee of Unsecured Creditors ("Committee"), objects to that portion of a first mortgage holder's proof of claim which represents a prepayment fee, or what the applicable loan documents (Promissory Note and Mortgage) also characterize as a "yield maintenance charge."[1]  A hearing was held November 28, 2012, at which time the parties submitted a 34 paragraph fact stipulation, with accompanying Exhibits "A" through "D" as the evidentiary record for purposes of the resolution of this contested matter.  The Court incorporates the agreed facts and documents in their entirety herein.  The issue has been extensively briefed and argued.  Upon consideration of the evidence, oral argument and all written submissions, the Court finds in favor of the claim objectors and will disallow the prepayment fee as a part of the Lender's claim.

*Background*

      The parties' fact stipulation chronicles their relationship from the inception of the underlying indebtedness to the present. It need not be fully recounted here, but

---

[1] The Proof of Claim itself refers to the fee in question as an "Estimated Defeasance Cost."

reference will be made to it as necessary. The crux of the dispute centers on a few key passages in the Note and Mortgage which describe the circumstances upon which the prepayment fee at issue becomes owed. The Court will analyze the relevant portions of the loan documents below.  Generally speaking, however, the Debtor's Lender ("Wells Fargo") takes the position that the fee became an affirmative part of the borrower's indebtedness on March 3, 2010, after the Debtor had defaulted on its payment obligations and Wells Fargo, in turn, had accelerated the maturity date of the loan.  The Debtor and the Committee ("Objectors") conversely maintain that the triggering events required in order for the prepayment fee to accrue have not occurred as of this time, such that no fee is now due.  Both sides strenuously insist that the clear language of the relevant instruments unequivocally supports their respective positions.  The amount in controversy is sizable at approximately $15 million, making this determination one of clearly significant impact to the Chapter 11 case.

***Discussion***

At the outset the Court notes the parties' general agreement that where the terms of the parties' contract provide for the assessment of a prepayment fee, and the requisite preconditions are met, the contract provision is typically enforceable under state law. (New York Law governs here pursuant to pursuant to § 2.07 of the Promissory Note. *See* Exhibit "A.")

The Debtor argues, however, that there is an overarching exception to this principle where the issue arises in a bankruptcy case.  The Debtor cites in support the decision in *In re Calpine Corp.*, 365 B.R. 392, 397 (Bankr. S.D.N.Y. 2007) where the Court stated:

2

> Generally, no-call provisions that purport to prohibit optional repayment of debt are unenforceable in chapter 11 cases. *Continental Secs. Corp. v. Shenandoah Nursing Home P'ship,* 193 B.R. 769, 774 (W.D.Va.1996)(affirming Bankruptcy Court's holding that "while there is a prepayment prohibition, [it] is not enforceable in this [Chapter 11] context"); *In re Skyler Ridge,* 80 B.R. 500, 502 (Bankr.C.D.Cal. 1987); *In re 360 Inns, Ltd.,* 76 B.R. 573, 575–76 (Bankr.N.D.Tex.1987) (authorizing repayment of a note despite ten-year prohibition on repayment); *see In re LHD Realty Corp.,*726 F.2d 327, 329 (7th Cir.1984); *cf,* George Lefcoe, *Yield Maintenance and Defeasance: Two Distinct Paths to Commercial Mortgage Prepayment,* 28 REAL EST. L.J. 202 (Winter 2000) ("Lefcoe Article")(courts universally enforce absolute prohibitions against prepayment, "except in bankruptcy"). The "essence of bankruptcy reorganization is to restructure debt … and adjust debtor-creditor relationships." *See In re Ridgewood Apts. of DeKalb County, Ltd.,* 174 B.R. 712, 720 (Bankr.S.D.Ohio 1994). It would violate the purpose behind the Bankruptcy Code to deny a debtor the ability to reorganize because a creditor has contractually forbidden it. *Continental Securities Corp. v. Shenandoah Nursing Home Partnership,*188 B.R. 205 (W.D.Va.1995).

Wells Fargo makes scant response to the foregoing authorities, but argues instead that the Debtor has "effectively conceded" this question, and points to language in the Debtor's written objection where the Debtor states that prepayment penalties are only allowable in bankruptcy where they are specifically provided for and where the terms governing the imposition of the fee are specifically met.

The Court agrees that there may be some internal inconsistency in the language of the Debtor's pleading, but it does not interpret it nearly as broadly as Wells Fargo. Which is to say that the Court does not believe the point to be conceded, nor the argument abandoned.  Further the Court notes that while the Court in *Calpine* held that the terms of the parties' contract did not require a prepayment penalty under the

circumstances of that case, it is possible that the *Calpine* Court might have reached the same conclusion even had the circumstances been otherwise in view of its endorsement of the body of law it cited in support of a general proscription of prepayment penalties in bankruptcy cases. All of which makes the present case quite similar to *Calpine,* because this Court similarly views the imposition of prepayment fees to be generally inimical to the purposes of Chapter 11 but, as in *Calpine,* finds that in any event the conditions prerequisite to the imposition of a prepayment penalty have not been met under the circumstances of this case.

Turning to the latter question, the Objectors point initially to Sections 1.02(a) and (b) of the Note, which provide as follows:

>    1.02    Prepayment.
>
>    (a)    Borrower may not voluntarily prepay this Note in whole or in part at any time prior to the expiration of the Lock-out Period, nor shall Lender be obligated to accept any such prepayment tendered by Borrower. "Lock-out Period shall mean the period of time from the date hereof to, but not including, the date that is three (3) months prior to the Maturity Date. After the expiration of the Lock-out Period, Borrower may prepay this Note in whole only, provided, that (i) written notice of such prepayment is received by Lender not more than sixty (60) days and not less than thirty (30) days prior to the date of such prepayment, (ii) such prepayment is accompanied by all interest accrued hereunder and all other sums due hereunder and under the other loan Documents (as defined in Section 1.04) and (iii) such prepayment (x) is received by Lender on a Payment Date, or (y) if not received on a Payment Date, is accompanied by a payment of interest, calculated at the Note Rate, on the amount prepaid, based on the number of days from the date such prepayment is received through the next Payment Date.
>
>    (b)    Except as hereinafter provided in this subparagraph (b), in the event that any prepayment is accepted by Lender prior to the expiration of the Lock-out

> Period, or if a prepayment results from Lender's exercise of its remedies hereunder, Borrower shall pay Lender a Yield Maintenance Charge (as defined below) in connection with such prepayment. Prepayments of this Note prior to the expiration of the Lock-out Period shall be permitted without notice, and without the imposition of a Yield Maintenance Charge or any other premium or penalty in connection with Lender's application of insurance or condemnation proceeds on account of the Loan (as defined in the Security Instrument, as defined in Section 1.04 hereof) in accordance with the terms and provisions of the Security Instrument, provided, however, if an Event of Default shall have occurred and be continuing at the time of the related casualty or condemnation, in addition to applying such proceeds as provided in the Security Instrument, Borrower shall pay a Yield Maintenance Charge to Lender. Lender, at is option, may elect to use such proceeds and Yield Maintenance Charge to defease an amount of the Loan equal to the proceeds applied as a prepayment, in the manner provided in Section 1.03 below. Any prepayment during the Lockout Period shall not reduce the Monthly Payment Amount payable hereunder unless such prepayment is accompanied by a Yield Maintenance Charge and Lender elects, in its sole discretion, to defease all or a portion of the Loan with the related proceeds.

The Objectors argue that, per the above, the conditions prerequisite to the imposition of the prepayment fee are limited to 1) where the prepayment is accepted by Wells Fargo prior to the expiration of the Lock-out period, or 2) where prepayment results from Wells Fargo's exercise of its remedies under the Note. The Objectors argue that neither of these two conditions have occurred and, accordingly, no prepayment fee may be assessed.

Wells Fargo does not take issue with the proposition that neither of the two described events have occurred, but focuses instead on language found in the Mortgage, specifically, Section 3.1 (a) thereof which provides:

5

      3.1   <u>Remedies Available</u>.  If there shall occur an Event of Default under this Mortgage, then the Property shall be subject to sale and this Mortgage shall be subject to foreclosure, all as provided by law, and Lender may, at its option and by or through a trustee, nominee, assignee or otherwise, to the fullest extent permitted by law, exercise any or all of the following rights, remedies and recourses, either successively or concurrently:

      (a)   <u>Acceleration</u>.  Accelerate the maturity date of the Note and declare any or all of the Obligations to be immediately due and payable without any presentment, demand, protest, notice, or action of any kind whatever (each of which is hereby expressly waived by Borrower), whereupon the same shall become immediately due and payable.  Upon any such acceleration, payment of such accelerated amount shall constitute a prepayment of the principal balance of the Note and any applicable prepayment fee provided for in the Note shall then be immediately due and payable.  Upon the full payment of the Note following such acceleration, Lender shall have no further remedies hereunder.

and Section 3.1(e)(1), which provides:

      (e)   <u>Foreclosure</u>.  Immediately commence an action to foreclose this Mortgage or to specifically enforce its provisions or any of the Obligations pursuant to the statutes in such case made and provided and sell the Property or cause the Property to be sold in accordance with the requirements and procedures provided by said statues in a single parcel or in several parcels at option of Lender

      (1)   In the event foreclosure proceedings are filed by Lender, all expenses incident to such proceeding, including, but not limited to, reasonable attorneys' fees and costs, shall be paid by Borrower and secured by this Mortgage and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.  The Obligations and all other obligations secured by this Mortgage, including, without limitation, interest at the Default Interest Rate (as defined in the Note), any prepayment charge, fee or premium required to be paid under the Note in order to prepay principal (to the extent permitted by applicable law) reasonable attorneys' fees and any other amounts due and unpaid to Lender under the Loan

6

>    Documents, may be bid by Lender in the event of a
>    foreclosure sale hereunder. In the event of a judicial sale
>    pursuant to a foreclosure decree, it is understood and
>    agreed that Lender or its assigns may become the purchaser
>    of the Property of any part thereof.

and Section 3.2(c), which provides:

>    3.2    <u>Application of Proceeds</u>. To the fullest extent
>    permitted by law, the proceeds of any sale under this
>    Mortgage shall be applied to the extent funds are so
>    available to the following items in such order as Lender in its
>    discretion may determine:
>
>    *    *    *
>
>    (c)    To payment of the Obligations and all other
>    obligations secured by this Mortgage, including, without
>    limitation, interest at the Default Interest Rate and, to the
>    extent permitted by applicable law, any prepayment fee,
>    charge or premium required to be paid under the Note in
>    order to prepay principal, in any order that Lender chooses
>    in its sole discretion.

The parties agree that the maturity date of the Note was accelerated on March 30, 2010. At the outset the Objectors cite to that line of cases, including this Court's decision in *In re 400 Walnut Associates, L.P.,* 461 B.R. 308 (Bankr. E.D. Pa. 2011), which recognizes that, generally speaking, after the acceleration of the maturity date of a loan any subsequent payment, by definition, cannot be a prepayment. *Id.* 461 B.R. at 321. The Objectors do acknowledge, however, as Wells Fargo notes, and as this Court does as well, that the allowance of a prepayment penalty generally cannot be avoided where there exists an express provision for a prepayment premium and the triggering events have occurred.

Simply put, Wells Fargo argues that Section 3.1(a) of the Mortgage is such an "express provision" while the Objectors argue that it is not.

7

Wells Fargo argues that under Section 3.1(a) of the Mortgage acceleration of the debt caused the prepayment fee to become a fixed, non-contingent liability of the Debtor, and that at that point in time it became a part of the Debtor's "Obligations," as defined in the preamble to the Mortgage at page one thereof.  Wells Fargo argues that its interpretation of Section 3.1(a) is the only correct one, and that its interpretation is buttressed by the reference to the prepayment fee found in Section 3.1(e)(1) and 3.2(c) of the Mortgage. Further, Wells Fargo notes that to the extent that there is any conflict between language in the Note versus language in the Mortgage, the terms of the Mortgage, which are incorporated in the Note, are controlling pursuant to section 5.8 of the Mortgage. In particular, Wells Fargo argues that Section 1.02 of the Note should not be read as defining the <u>only</u> two circumstances when a prepayment fee could accrue, because it does not expressly so state, and because to do so would allegedly render it inconsistent with Section 3.1(a) of the Mortgage.

The Objectors interpret Section 3.1(a) of the Mortgage quite differently.  They focus on the second sentence of the subparagraph, which recites that after acceleration it is the <u>payment</u> of the accelerated amount which constitutes a <u>prepayment</u>, and that the prepayment fee only <u>then</u> becomes due and payable.  As there has been no <u>payment</u>, the Objectors argue that the prepayment fee has not come due.

Further to the point, the Objectors stress that the second sentence of the subparagraph refers to "any applicable prepayment fee provided for in the Note."  This, they say, returns one to Section 1.02 of the Note and the two conditions described there as giving rise to a prepayment fee, neither of which conditions, they reiterate, has occurred.

8

The Objectors argue that additional textual support for their interpretation of subparagraph 3.1(a) can be found in Section 1.06 of the Note, which provides, as follows:

> 1.06 <u>Event of Default</u>. It is hereby expressly agreed that should any default occur in the payment of principal or interest as stipulated above and such payment is not made within seven (7) days of the date such payment is due (provided that no grace period is provided for the payment of principal and interest due on the Maturity Date), or should an "Event of Default" (as defined in the Security Instrument) occur, or should any other default occur under any of the Loan Documents which is not cured within any applicable grace or cure period, then an "Event of Default" shall exist hereunder, and in such event the indebtedness evidenced hereby, including all sums advanced or accrued hereunder or under any other Loan Document, and all unpaid interest accrued thereon, shall, at the option of Lender and without notice to Borrower, at once become due and payable and may be collected forthwith, whether or not there has been a prior demand for payment and regardless of the stipulated date of maturity.

Missing from the above definition of the amount which is "accelerated" upon default is any reference to a prepayment fee. The Objectors reason from this that upon acceleration of the Note the prepayment fee does not become a part of the accelerated debt.

The Court finds the Objectors to have the better part of this interpretation dispute.

Although the Debtor argues that for present purposes the relevant inquiry begins and ends with the Note, such that one has no need to even consider language in the Mortgage, the Court finds this argument untenable. Wells Fargo is correct that the terms of the Mortgage are incorporated in the Note, such that its provisions must be considered. The Court, however, disagrees with the Wells Fargo's argument that "the

9

clear language of the Note and Mortgage, read as a whole, demonstrates that the prepayment fee comes due immediately on default and acceleration. (Wells Fargo 11/30/12 Brief at ¶ 11.)

Intuitively one might surmise that liability for something denominated a "prepayment fee" would perforce depend on there in fact being a payment. Parties, however, are free to contract otherwise if they so choose. Here it is clear they did not. The Objectors are correct that penalty provisions in contracts are to be strictly construed (citations omitted) Accordingly, the words the parties have used cannot be lightly disregarded. There is no doubt that the second sentence of subparagraph 3.1(a) supplements the first sentence and provides a temporal qualification to the accrual of the prepayment fee. That is to say that there must be a payment of the accelerated amount for the fee to accrue (assuming for purposes of discussion only that the fee forms part of the accelerated debt under Section 1.06 of the Note.) The text could not be clearer that <u>then</u> and only <u>then</u> does the fee become due and payable.

Any other reading is illogical. Wells Fargo, for example, argues that upon acceleration the prepayment fee became part of the "Obligations" that become immediately due and payable by reasons of the first sentence of subparagraph 3.1(a). Such a reading completely nullifies the second sentence, rendering it wholly superfluous. In other words there is no need to declare "immediately due and payable" in the second sentence what has already become "immediately due and payable" pursuant to the first sentence. Contract provisions should be read to harmonize and give effect to all of their terms. Well Fargo's reading of Section 3.1(a) is violative of this canon. The only way to harmonize the two sentences of subparagraph 3.1(a) is to

10

acknowledge the additional language employed in the second sentence and give that language effect.

Interestingly, both sides cite, in support of their respective positions, to a recent New York decision involving this issue. *U.S. Bank Nat. Ass'n v. South Side House, LLC*, 2012 WL 273119 (E.D. N.Y. January 20, 2012) In *South Side* the Bankruptcy Court and the District Court on appeal rejected a lender's claim to a prepayment fee, finding that the relevant loan documents did not make prepayment consideration due upon default and acceleration alone. *Id.* at *8 As Wells Fargo notes, the lender in *South Side* had argued that its loan documents provided for the contested fee and had argued to the Court that the language in its loan documents was virtually identical to a hypothetical "model" clause discussed in a similar context by the Court in *Northwestern Mutual Life Ins. Co. v Uniondale Assocs.*, 816 N.Y.S.2d 831 (N.Y. Sup. Ct. 2006). *See South Side, supra* 2012 WL 273119 at *9. The *Northwestern* Court concluded that the model clause would have permitted enforcement of the prepayment fee at issue there, and the Court in *South Side* agreed that under the model clause default and acceleration would always trigger a lender's right to demand a prepayment fee. *Id.* at *10 The text of the "model" clause states, as follows:

> Any tender of payment by Borrower or any other person or entity of the Secured Indebtedness, other than as expressly provided in the Loan Documents, shall constitute a prohibited prepayment. If a prepayment of all or any part of the Secured Indebtedness is made following (i) an Event of Default and an acceleration of the Maturity Date, (ii) the application of money to the principal of the Loan after a casualty or condemnation, or (iii) in connection with a purchase of the Property or a repayment of the Secured Indebtedness at any time before, during or after, a judicial or non-judicial foreclosure or sale of the Property then to

>    compensate Holder for the loss of the investment, Borrower
>    shall pay an amount equal to the Prepayment Fee.

Wells Fargo distinguishes its own case from *South Side.* The lender's problem in *South Side* had to do with its failure to provide that the prepayment fee would be due in the event that the lender foreclosed on its collateral and the borrower failed to redeem after the sale. Wells Fargo argues that because subparagraph 3.1(e) of the Mortgage references a prepayment fee in the context of foreclosure it would have fared better than the *South Side* lender before that Court.

Once again, however, specific language is critical. The Mortgage at subparagraph 3.1(e) does not reference "the" prepayment fee as Wells Fargo asserts in its November 30, 2012 brief at paragraph 15. On the contrary, it references "any prepayment . . . required to be paid under the Note." That returns the inquiry back to Section 1.02(b) of the Note and its description of the specific two events which have not occurred. The result, moreover, is not altered by virtue of the reference in the preamble to the Mortgage to "all prepayment fees." The fairest reading of that passage is that *if* a prepayment fee becomes owed it becomes a part of the mortgagor's "Obligations." This is particularly so in view of the fact that Section 1.06 of the Note makes no reference to a prepayment fee in describing what is accelerated upon a default.

The same reasoning undermines Wells Fargo's reliance on Section 3.2(c) of the Mortgage, which discusses the application of sale proceeds and makes reference to "any prepayment fee or charge . . . required to be paid under the Note." There is no question that the loan documents contemplate the possibility of a prepayment penalty and discuss how much it would be and how it might be treated in various situations.

Consideration of these issues must give way however to the threshold question of what actually triggers the fee.

In the end, the absence of specific language to support Wells Fargo's position on this question is its undoing. It its legal memoranda, Wells Fargo repeatedly asserts that the loan documents, read as a whole, clearly and absolutely provide that the prepayment fee accrues upon acceleration. Saying it repeatedly, however, does not make it so. Wells Fargo's reasoning is simply conclusory.

Notably, Wells Fargo itself concedes that its Mortgage here does not utilize the model clause. Rather, Wells Fargo states that its Mortgage "tracks concepts found in the model clause." That will not suffice. Just as the lender in *South Side,* the argument fails because *inter alia* the prepayment trigger is the borrower's actual tender of the accelerated amount following the occurrence of either of the two events described in Section 1.02 of the Note. Those triggering events have not occurred and accordingly the fee is not now due.

The foregoing conclusion is also dispositive of the issue of whether Wells Fargo holds a pre-petition "claim" for the prepayment fee as the latter term is defined in Bankruptcy Code Section 101(5). Wells Fargo's "right to payment" of the prepayment fee had not arisen as of the petition date under the clear language of the loan documents. As a consequence the fee could only be allowable as a post-petition charge under Bankruptcy Code § 506(b). Wells Fargo concedes that it is under secured and it is well established that an undersecured creditor is not entitled to post petition interest, fees, costs or charges. *See* 11 U.S.C. § 506(b); *United States Savings Ass'n of Texas v Timbers of Inwood Forest Assocs. Ltd.,* 484 U.S. 365, 372, 108 S.Ct. 626,

13

632 (1988).  Accordingly, the prepayment fee component of the Wells Fargo claim must be disallowed in its entirety.

An appropriate Order follows

By the Court:

_____
Stephen Raslavich
Chief, U.S. Bankruptcy Judge

Dated:  December 5, 2012